May it please the Court, my name is Michael Riley, representing the appellant, Calence, in this matter. We are here appealing the denial of a preliminary injunction in a case that involves unfair competition, breach of fiduciary duties, breach of contracts not to solicit employees. By way of background, Calence learned in February of 2006... I think we know the facts. Focus on the issue of irreparable injury. That's what the district court focused on and found that damages would adequately compensate you. I think given our standard of review of a preliminary injunction, there's a bit of an uphill battle you face here. So if you could focus on the irreparable injury, that at least I think would be helpful to the Court to start out with. Thank you, Your Honor. When you look at the San Martino standard, the Court says you have to look at likelihood of prevailing on the merits and irreparable injury. I'll answer irreparable injury and then get back to the merits that was not addressed by Judge Martinez. But the Court asks, what was the evidence of irreparable injury? Here they were. They wiped out the presence of this company in Seattle. That's record at 43. It destroyed the ability to seek new customers. It destroyed the ability to take new orders from current customers. It destroyed the ability to service the customers they presently had. The company also lost secrets. Under the Trade Secret Act and the Irreparable Injury Act. So we believe there was irreparable injury presumed anyway and that would be the Sirison case. They took project knowledge, preferences, and budgets and funding. That's all in the record. They took that. That certainly would be irreparable injury. They lost goodwill. And we presented that first in Mr. Fong's declaration that was not considered. But then in response to the defense by saying you're up and running with this skeleton office, you must be doing well, Mel Stevens, who had been there only a month, her deposition was taken after we brought our motion, says no. The customers are, her words, pissed off. Well, the court cases say that damage to goodwill certainly is irreparable injury. And so when you look at the cases and what we presented, we definitely believe we presented more than enough evidence to show irreparable injury. But getting back to the standard here, the court should have and did not assess the likelihood on the merits. And if there was substantial likelihood, we only had to show a possibility of irreparable injury. If we showed a strong or just a serious questions about prevailing on the likelihood, then we would have to show the balancing issue. But contrary to Dimension Data's brief at context, a quote from the order, and they represent to this court that the trial court actually considered the likelihood on the merits, that was wrong. They did not. The court at 141 in this record expressly did not do it. But if you look at the quote at page 4 of their brief, they specifically take a quote out of context to represent to this And so why is there a likelihood of the merits here? Well, after the TRO, which was probably a reasonable decision to deny, because the defendants had systematically represented to the court false statements. They systematically represented to the court they didn't take any trade secrets. They had no Kalins information whatsoever. Mr. Falk specifically represented under penalty of perjury, he had not aided or induced the recruitment of these Kalins employees. And so maybe that decision was reasonable on the record. But when the deposition show there were 32,000 documents taken that Mr. Falk, even though he was told not to take notebooks that 99% of which contain confidential Kalins information, he took them anyway, even though he denied under penalty of perjury, he had not taken them. By the time of the preliminary injunction, we had 32,000 documents. We had notebooks taken. We had BlackBerries that had downloaded Kalins customer contacts into dimension data information. And then you had these reams of Kalins confidentially marked information and trade secret marked confidential information in their possession. And not only that it was there, but it had been circulated up and given to Mr. Falk. And even in the record when we questioned Mr. Dunlap about it, he even admitted they could have been copied 14 times as far as we know. Mr. Falk had all the, he took the Kalins office and he had it all circulated in there. And so then you know, in our view, first there was a breach of his duty not to What did Mr. Falk do? He specifically disclosed information that would aid in solicitation. He gave them target incomes. He gave them, he specifically negotiated the times when bonuses would be allowed to these people. He provided, and this is all while he was employed at Kalins, he was providing budget information to dimension data so they would know how much to budget to each employee. He was already working for dimension data by the time of this. So for the non-solicitation piece, that was a likelihood on the merits. We didn't even have to prove irreparable injury. When you look at the San Martino case, it says if there's 100% certainty of prevailing on the likelihood of the merits, you don't even have to get to the issue of irreparable injury. We certainly believe we carried that. Mr. O'Reilly, what is the current status of Kalins' Seattle operation? It's not particularly in the record. The record would say that we had three, four, five individuals. I can tell you it's been decimated. Sales are way, way down. And the record that's developed since this injunction shows lots of sales have gone to dimension data that are past Kalins' clients. So it's definitely devastated. But it's not closed? It's not closed, no. It is operating. And perhaps that gets to a point that was raised by the defense. They said there's no irreparable injury because you have some type of an office going. And our position here before this court is that's not really the test that should be applied here. I mean, if you look at it... You asked for an injunction that basically would prevent the 12 or 13 employees who used to be your employees from essentially engaging in that livelihood in Seattle. And yet, when your company was acquired by another company, there was no security provided in terms of employment agreements for most of those employees. They were free, were they not, to simply walk out the door at any time, which would have put you in exactly the situation that you're in now. You didn't have employment agreements with them that said you can't do that. Your Honor... Why isn't damage is an adequate remedy to the extent that you can prove them? And why wasn't the district court correct in so concluding? Well, again, the court never even addressed the likelihood of success on the merits. We began with that. Well, I understand, but the court did address the fact that Kalins brought in people from other offices in the country to service the existing accounts. And you've just conceded the office is still open. Granted, it's not doing as well. I wouldn't expect it to be doing as well if all of its employees who were there at the time are gone. And that, Your Honor... You really wanted, in essence, a legal ball and chain on all 13 of these employees. And as near as I can tell from the record, there was only one, and I guess that's Mr. Falk, that you might arguably have some kind of a claim with regard to non-competition. I would completely disagree with that, Your Honor. This is not... I'm looking at the record the district court looked at. This is not a non-competition agreement case. This is an unfair competition case. I'm trying to figure out what's unfair when the district court found that your client had been, if you want to use that term, unfair in not making any provision for the 13 employees who were obviously left in a great state of uncertainty vis-a-vis their own livelihoods as a result of the acquisition. Your Honor, at page 816 of this record, we specifically told the court, these employees can go ahead and go out and market all they want, their livelihood. They should keep it. That's at page 816 of the record. But what we said is, would you leave the 10% of the market that we have here? It's a $300 million market. That's a record 902. We had 10% of the market, and we're saying, go out, go forth at page 816, take on the 90% of the market we don't have. But would you at least stop using, do not rely upon, our trade secrets for the 10% business? Your trade secrets are guaranteed as the 10% share of the market. No, it's not just our trade secrets, Your Honor. It's the business that they have. Your proposed injunction was essentially, and the way you just described it is the way I read it, which is basically, we don't want these former employees having anything to do with these existing customers in Seattle of Kalen's. That's what you asked for. That's what I asked for. Basically, what you're asking for is a court-ordered injunction that we get to keep all the customers that we have now, and these former employees of ours can't talk to any of these former customers. Basically, they can't compete with us for these customers. That's what you were asking for. I asked for that, and the reason is because they had breached fiduciary duties. There was a fundamental decision by Dimension Data and Falk to violate fiduciary duties and a non-solicitation of our employees. I do want to get back to the court's point. Non-solicitation of employees, that goes to Falk and Dimension Data. He's the ringleader for, as you're alleging, the employees that he recruited. You're saying that because they breached some fiduciary duty to your client, that if they opted to leave, the employees of your client could not, because they have some fiduciary restraint, talk to their former clients? Your Honor, what we're saying is Dimension Data knew there was a non-solicitation of employees agreement. Falk shouldn't disclose. He violated that non-solicitation, enabling Dimension Data to make attractive offers to these individuals, that they shouldn't benefit from that. Well, I know, but I'm still trying to understand, I think, as Judge Tolman's question was raising, the scope of the injunction, which would reach out and say, unless these employees themselves have violated some duty, contractual or fiduciary, to your client, what is the rationale for hiring people that they have been dealing with? Do you have non-comp agreements? Because they had a duty not to take confidential information. They swore under penalty of... And confidential information is the identity of the customer? That's part of it, but they have... So you're saying that the 10% of the market that your client had was based on relationships that have been developed for the benefit of your client, by employees who got paid to do that. That's correct, Your Honor. And when they decided to leave, whether under inducement or if they even left voluntarily, they had an enforceable obligation not to contact or trade on the fact that they happen to know, because they had a Rolodex, Blackberry, whatever, with the customer's name. They were off limits. It wasn't just... It wasn't just a matter of Washington law. How long is that enforceable? Well, the courts would say if they take trade secrets, you've got the Salyutek case that had it at six years. I understand. I'm familiar... Well, if they are trade secrets, and you're saying that under Washington law, customer identity is, in fact, a trade secret. I think customer identity, customer history, customer past history of ordering... What case would you cite for that authority? Because my understanding of non-competition agreements under Washington law is that this state is very restrictive, both as to geographic and temporal proximity as to how long and what constitutes a breach of a non-competition agreement, which you didn't have with anybody here. No. Again, Your Honor, we cited the cases that when someone takes trade secrets, one of the remedies is you presume irreparable injury, and you issue an injunction that they not use that information. You're giving us, without telling us the definition, a very broad reading of what constitutes a trade secret, and I'd like to know what case you're relying on that's going to help me agree with you that a trade secret includes the identity of a customer. The Nagrowski case is one of them, Your Honor. Nagrowski? Nagrowski. You're saying Nagrowski, our case. That's your best case. Well, it's one of them. I can certainly provide you others. No, no, that's fine. But again, it's not just the customer list, even though they were downloaded by Avin to the Dimension Data System. It's the profit and margin discount type of information they took. And remember, all of this they denied having. And here's the problem when you have a trade secret and why you do have an injunction, is because once a secret is out, it's not a secret anymore. No, I think we understand that. So what we're asking I've litigated trade secret cases myself. At least, I think we all are pretty aware that once a secret is out, you can't shut the barn door. No, I understand. That's correct. I'm just trying to understand in the context of your case and Washington law what the ground rules are. Right. I see my time's up. Thank you. Yeah, thank you. I would like one minute rebuttal if I had. I'll give you one minute. That's great. My name is Clem Barnes. In between these two guys, I represent the employees that their It's clear to me from the questions Are you guys splitting your time or what? We're splitting our time and I'd like to address just a couple things from the employee's perspective and leave it to Mr. Sanders to talk about what the trial court did. Whatever you take up, he doesn't get. In terms of time. Stop me. That's fine. Stop me as soon as I can. Okay. I've used up 15 seconds. Go ahead. I'll talk fast. No, I'll give you back the 15 seconds. All right. This is a simple situation from our perspective. And I represent not only John Abb, the person who had the BlackBerry with his contacts in it, and Tom Falk, and now Jud Dunlap, the fellow, the engineer who backed up his files on a disk and turned them over to Mr. Sanders to return to. And that's what happened to him. And I've represented the other employees during the depositions. So that's the perspective I bring to this. And that's exactly how we look at it. These were at-will employees. And that door opens from both sides. They have no protection against being laid off in the context of a merger, which is a natural concern. They don't have employment agreements with severance. None of them do. This is not a situation where you have a non-compete and there's severance that covers you while you're on the sidelines. So they don't have that kind of protection. They have no protection. But on the other hand, they're free agents. They don't have non-solicitation. They're not free agents while they're under contract or under employment with their current employer, though. They're free agents in the sense that they can listen to offers from other employers. Well, you're not suggesting that just because someone is an at-will employee that they have the right to go into a business, get all of their business's proprietary information, and then run away with it, that somehow they have been given ownership interest in the proprietary information? Of course not. Of course not. That isn't what happened here. Well, that's what they're alleging happened, essentially. Let's talk about what really happened. Let's talk about what really happened. And I do want to make two other points. There's no non-compete and there's no non-solicitation of customers. And what's really happening here is an effort to get an order that, in effect, creates one that they didn't have rather than an order that enforces one that they did, as in a non-compete case. But, no, they don't get to run out the door with private confidential information. They can't go out and compete with proprietary or trade secret information. I understand all that. What's here that's a trade secret? Let's talk about John Allen. Rolodex is the exact analogy I would use. I'm an old-school guy who used to have one of those things. You punched an A or a B or a C and the thing pops up. Ab's got a Blackberry that has all his contacts, the restaurants he goes to, his mom's phone number, and the people that he contacts during the daytime. Washington law is real clear, and that's the case that they're citing, the Naragoski case. If a customer list, now we'll talk about whether this is a customer list, but even a customer list is not a protectable interest of the employer when you can create that from information that's available to the public generally. John Ab's clients were 95%, 99% all public sector accounts. You can figure out who's buying products for them by going to the Internet. You can pop that up. That's information that's publicly available. Next, this isn't like John Ab goes into the computer and pulls up a list of all the customers of Kalen's. This is John Ab's own numbers that he calls. It's his contacts. It's not their customer list. Jennifer Dare, who's mentioned in our briefing, Jennifer Dare worked for numbers of years with Tommy Bahama, to take an example, that's prominent in their briefing, a number of years. She comes over to Avnet for about three months before the decision is announced that they're going to merge with this company they know nothing about. She's done business with these people for years and years and years through four different companies. Basically, your point is what's the bottom line point you want us to take away? That's hers. She can't. No, I mean generally. You're running out into his time, so I want to know what is the bottom line you want to communicate to us. Two things. One, nothing that was taken here was trade secrets. Number two, a misappropriation of trade secrets requires you to use or disclose them. Use or disclose them. There's nothing to enjoin about the, quote, solicitation of employees, which you've read our brief and understand is something we deny. But it doesn't matter. That's done. What you're looking at is future harm. Are they using trade secrets or is there a threat that they're using trade secrets that has to be enjoined? The answer is no. There's no evidence of that. Second, the remedy they're asking for is even this, quote, fact of the matter is they will either cost the people I represent their jobs or they would impose what amounts to a non-solicit, non-compete through a court order that these people never signed and never were paid to have, and it will essentially put them on the sidelines. And that includes the other thing to consider in balancing the harms here is not just the employees that I represent but their customers. These people are working with customers to establish security systems and phone systems, and this is no place for an injunction. Four months from now we have a trial for damages. All right. Thank you. Good morning, Your Honors. I'm James Sanders. I'm here for Dimension Data North America. Heading up on a few points that the panel is obviously interested in, there was an extensive review of these employees' activities before they left Kalins, by Kalins. They have possession of all these employees' laptops. They've done forensic reviews of these laptops. They've gone into the homes of these employees, and they've had their experts do a forensic review of their home computers. From those reviews, there's not a single shred of evidence of any improper conduct, of any effort to take any information or to leave with any information. Well, he's made the allegation in his papers, and he made it here. I'm talking about your opposing counsel, that these employees walked out with not just the customer list, so let's assume for a minute that your co-counsel is correct and all they did was take the names of people who were publicly available. I would, I think, agree that in most instances where there is no non-compete agreement, that's probably not a problem under Washington law. But the allegation is that it was much more than that. It was internal accounting information. It was margin information. It was how to solicit customers, all kinds of proprietary information that would be clearly and unequivocally the property of the company and not under any circumstances the property of any individual employee or officer. You're saying that he's just flat wrong and that that was presented to the court and the court made a finding on that? Well, no, that's exactly right. There's no evidence to support that at all. The documents that they refer to, and they repeat it over and over again so it starts to have substance of their own way, they say over and over again they walked out with 30. This is the big lie of this case? 32,000 pages, 32,000 pages, 32,000 pages. The 32,000 pages are two CD-ROMs that Judd Dunlop burned before he even knew Dimension Data was in play, before he'd been contacted by them because he's an engineer and he likes to have backups. And he had them in his home office. Now, at the TRO hearing, we met with all of our people right after the meeting, and our manager, Mark Sturbey, the Vice President of the West, said to everybody, Look, go back and do a last sweep. Check the back drawers of your offices, the trunks of your cars, and don't make any call about whether you think things confidential or whatever. If it has to do with Abnett or Kalins, you turn it in to us. And over that weekend, these employees went back and they came up with half a box of materials, including these two CD-ROMs, which are the 32,000 pages, and they delivered it to me on the Monday morning after the TRO. And that box has been sitting on my office floor ever since, not in the possession of any of these employees. Right. So that goes to the merits, right? Well, that goes to whether there's a trade secret that's currently in the possession of anybody that could create a threat of discrimination. So why wouldn't you simply go to the district judge and say, Look, Your Honor, my clients haven't had this information. They don't have it now. They've never used it. And therefore, I wouldn't have a problem with an injunction enjoining them from using information which they don't have. That was never proposed. But we did say exactly all those things to the court in terms of we don't have any of this information. Therefore, there's no threat of irreparable injury. I mean, injunctions, I don't think injunctions are okay just because you're not breaching an agreement. Injunctions have an incredible power. It raises contempt issues. What do we do with, though, the argument that the district court did not address probability of success on the merits? So we have a lot of merits argument before us and not a whole lot of information from the district court on that subject. Well, the district court was correct in deciding that there had been no showing of an imminent threat of irreparable harm. Well, no, that's not my question. That's the second prong. The district court quotes the standard properly and says it's a two-pronged approach. One is probability of success on the merit, and it's a sliding scale on irreparable injury because if you have a high probability of success on the merits, then you have a much lower burden to show on irreparable harm. So what did the district court do with respect to probability of success? Did we find anything where the court makes a finding on that prong? Well, no, the district court did not make a finding on the likelihood of success. The district court properly concluded, following authority from the circuit, that if the showing of a threat of irreparable harm is inadequate, you don't need to get into likelihood of success on the merits. Really? What case is that? Well, I'll have to pull the court's order, but the court does cite that. So what you're really saying is that in this case, because you're essentially suggesting that the court found that there was none of this information out there floating around, and therefore you're kind of conflating the two, because then there is no irreparable injury because there is no way in which they could be irreparably injured by information that doesn't exist in their possession. That's what you're suggesting. Exactly. I mean, if you look at the – I would bite the panel. I'm just kind of coming around it from the back way, but – I would – they do conflate in this instance, and it's largely because if you look at Kalinz's motion for preliminary injunction, the entire motion, the entire motion is devoted to basically making summary judgment arguments about things that had already occurred. Now, injunctions are supposed to prevent future injury, damages remedy injuries that have already occurred. And you've got a damages trial coming up. In June. And so the two issues do conflate. There was no likelihood of success on the merits of any claims that threatened an imminent injury, an imminent threat of irreparable harm, and they do conflate to that degree. But the district court's step of the analysis is not incorrect. There was no evidence that would support a showing of any threat of irreparable harm. And given that, it didn't really matter what the likelihood of success was. Your case at Oakland Tribune. I'm sorry? Your case at Oakland Tribune. Oakland Tribune. Now, that said, had the district court looked at the likelihood of success of the merits, it would have found at best that it was a coin flip. And in that case, I would just urge the court to study very carefully the declarations of Mr. Zerbe and Mr. Falk that were submitted along with the opposition papers, the motion for the preliminary injunction. You know, one of the things that always strikes me in these cases, an injunction is an immediate remedy. It's something that you seek and you need it right now. The judgment, as I understand it in this case, was entered denying the injunction way back in July. That's correct. So now we're just a few short months away from trial. One wonders whether if there was any irreparable injury, it's already occurred anyway. Well, and that was largely true in April and July as well, Your Honor. I mean, they've rebuilt their office. This is kind of done already. Just to correct the record of some points that Mr. Riley made, the record evidence is that there were ten employees or thereabouts operating in Seattle as of May when we briefed this. In fact, we've since learned, because you've asked about the current status, that what they've done is they've put the operations of their Portland and their Seattle offices together, and they now have exactly the same number of employees that they had before. Well, that doesn't help us much because we don't know what effect that has. No, but the point being, you did ask about what's the current status, and they're up and they're running, and they actually are, experts say, more profitable than they've ever been because they're able to eliminate costs. No, that's not true. Okay. Okay, I'm sorry I asked. Okay. That's important. That's the point of error. Okay. Now. It won't affect our judgment. Okay. Let me just comment briefly on the mechanism, the decision-making mechanism that Judge Martinez used, because he basically said he struck a significant amount of the materials from consideration that Cale has submitted, because he found that they had sandbagged on their opening brief. Again, take a look at that opening brief. There's not a single sentence that talks about the balance of hardships. There's not a single sentence that talks about interests of third parties. There's one sentence in a footnote that talks about irreparable injury. I mean, that is not. Well, they tried to incorporate their argument, and that was Judge Martinez's concern, so we understand. Right. And, well, of course, they tried to incorporate a TRO that had not been successful, so I'm not sure why it would have helped to do that as well. The last point I'll make, just about the presumption of injury, the Ciarasen case involves a presumption of injury that's found after a jury trial found that Ciarasen was using Boeing-designed plans to build airplane windows. Okay. And what the Supreme Court, the Washington Supreme Court, said is, Look, if we found it's a trade secret, and we found that your competitor is using it to build windows, you don't also have to show irreparable harm to get an injunction stopping you from doing that. That, of course, has no issue at all here. Okay. Unless you have another. Okay, thanks. Judge Fischer has given you the non-existent minute. This will be quick. Good. We're relying on the San Martin. You do understand this case. I understand the court knows this, and that's great. San Martino case says you should look, and actually at 965 of the San Martino case, it talks about each of those two items have to be weighed. But Oakland Tribune also says if there's no showing of irreparable injury, you don't have to get to probability of success. Well, and we believe we've carried that burden as well, Your Honor. So there's a sliding scale that the slide spoke with. How good would it do you now? Because we continue to have irreparable injury. Contrary to the representations by counsel, we are still having difficulty servicing clients. We do have ill will that has generated, continues to generate. We continue to have irreparable injury. And our damage expert actually said we have irreparable injury because it's continuing. Of course it's continuing. They took the whole team. And to get back to the issue of the injunction, the injunction should be focused on dimension data. They took the whole team. That was their plan. And that plan actually devastated it. So we ask that this court direct the district court to enter an injunction prohibiting them from marketing against Kalen's independent clients. Okay. Thank you. Thank you, counsel. We appreciate the argument. And the case argued is submitted.
judges: Fisher, Tallman, Ezra